FILED
JAN 20 2010
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY Deputy Clerk

**Kent VanDerSchuit Esq. SBN:** 192674
VanDerSchuit Law Group APC
5927 Priestly Drive. Suite 102
Carlsbad, CA 92008
Office: (760) 602-6234 / Fax: (760) 602-6235

Attorneys for Debtor(s)

**United States Bankruptcy Court**

**Central District of California**

| | |
|---|---|
| **IN RE:**<br><br>**Christopher T. Wedel**<br>**Julie Wedel**<br><br>Debtors<br><br>**CHRISTOPHER T. WEDEL**<br>**JULIE WEDEL**<br><br>Movants<br><br>**Bank of America**<br><br>Respondent | Case No.: **6:09-bk-410580-PC**<br>**CHAPTER 13**<br><br>**NOTICE OF MOTION AND MOTION TO VALUE REAL PROSPERTY; STRIP LIEN OF SECOND TRUST DEED BANK OF AMERICA**<br><br>Date: February 17, 2010<br>Time: 1:30 pm<br>Dept: 304<br>U.S. Bankruptcy Court<br>3420 12th Street<br>Riverside, CA 92501 |

**TO THE HONORABLE PETER H. CARROLL, RODNEY A. DANIELSON, CHAPTER 13 TRUSTEE, BANK OF AMERICA, and all other interested parties:**

**I.**

**FACTS**

The instant bankruptcy case, 6:09-bk-41058, was filed to save the real property including debtor's principle residence located at 2993 Cherry Laurel Lane, San Jacinto, CA 92582 ("The Property"). (See a copy of Schedule A filed in the instant case as exhibit "A" attached hereto and incorporated by reference.)

The fair market value of the property of $140,000.00 is based on a licensed California Appraiser's Uniform Residential Appraisal Report of Delux Lazich, a

California licensed appraiser, reflecting current value. (See Exhibit "B" attached hereto and incorporated by reference) to that effect.

The lien of the First Deed of Trust is currently held by IndyMac Mortgage Services in the approximate amount of $265,823.65. (See Amended Schedule D, and a copy of the home loan statement of IndyMac Mortgage Services dated 09/01/2009 in the instant case. Attached hereto as exhibit "C" and "D", respectively and incorporated herein by reference.) The Second Deed of Trust is held by Bank of America in the approximate amount of $65,729.69 (See copy of Mortgage Statement dated 08/28/2009 attached hereto as Exhibit "E" and incorporated herein by reference.).

## II.

## ARGUMENT

### A. A SECURED CLAIM IS SECURED ONLY TO THE EXTENT OF THE VALUE OF THE COLLATERAL AND UNALLOWED SECURED CLAIMS ARE VOID.

11 U.S. C Section 506(a) states that:

> An allowed claim of the creditor secured by a lien on property in which the estate has an interest, or that is subject to a setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest of the amount so subject to setoff is less than the amount of such allowed claim.

11 U.S.C. Section 506(d) states that:

> To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is **void**. (Emphasis added)

### B. THE DEBTOR MAY REQUEST AND THE COURT MAY ENTER AN ORDER THAT VALUES COLLATERAL WHICH IS PROPERTY OF THE BANKRUPTCY ESTATE AND WHICH SECURES A CLAIM OF A CREDITOR AGAINST THE DEBTOR.

Bankruptcy Rule 3012 states that the court may determine the value of a claim secured by lien on property to which the estate has an interest on motion of any party and after a noticed hearing.

**C. THE LIEN SHOULD BE AVOIDED AND RECONVEYED SINCE THE PROPERTY IS WORTH 250,000.00 OR LESS, AND THE FIRST DEED OF TRUST IS $284,433.03 THUS THE LIEN IS AVOIDABLE AND SHOULD BE REMOVED.**

The prevailing case law in our jurisdiction holds that Chapter 13 debtors are entitled to "strip off" totally unsecured junior mortgages on a principal residence where the claims of the junior lien holders are unsecured given that the value of the principal residence is less than the balance owed on the first mortgage. In re Lam. 211 B.R. 36 (9th Cir. B.A.P. 1997). In Lam, the court held a Debtor's completely unsecured junior mortgage could be stripped off his principal residence, holding that:

> The Nobleman decision holding that section 1322(b) (2) bars a chapter 13 plan from modifying the rights of holders of the claims, secured only by the debtor's principal residence, does not apply to holders of totally unsecured claims. The extension of the protections of section 1322(b) to wholly unsecured lien holders is contrary to the provisions in the bankruptcy code allowing dischargeability of unsecured claims.

In re Lam followed the earlier decision of in re Geyer 203 B.R. 726 (S.D Cal 1996) in Geyer the court sustained the Debtor's motion to avoid a lien brought under Bankruptcy Code Section 506(d), and held that a chapter 13 debtor may strip off a lien on his or her primary residence when the lien holder's interest is totally unsecured, stating that:

> …the term 'secured claim' as used in section 1322(b)(2) has the same meaning as the term "secured claim" in section 506(a). Unless there is some equity to which the creditor's lien attaches, there is no allowed secured claim and no entitlement to the protections against modification contained in section 1322(b)(2). A chapter 13 debtor may "strip-off: a lien on his or her primary residence, under the plan or under Section 506(d) when the lien holder's interest is totally unsecured.

In re Geyer, 203 B.R. 726, 729 (S.D. Cal. 1996)

Indeed, the Ninth circuit allows this when there is no equity to which the lien of the junior mortgage will attach, in re Zimmer, 313 F.3d 1229 (C.A.9 Cal.) 2002). Thus if there is no equity to which a junior lien attaches, that debt becomes an unsecured claim and can be removed as a lien on property on the entry of the chapter 13 discharge. It need not to be paid the same percent as other unsecured creditors.

Courts throughout the country agree that the decision of the United States

Supreme Court in Nobleman v. American Savings Bank, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed 228 (June 1, 1993) which prohibits a creditors claim on the residential real estate from being bifurcated into secured and unsecured portions from being modified does not prohibit a chapter 13 debtor from stripping off a totally unsecured mortgage on a principal residence. In re Lam, supre, in re Geyer, 203 B.R. 726; Woodhouse v. Woodhouse 172 B.R. 1 (D. Rhode Island, 1984) in re Sette, 164 B.R. 453, 456 (Bankr.D.Conn. 1993); in re Plouffe 157 B.R. 198 (Bankr. D. Conn 1993) (a literal reading of Section 1322(b)(2) does exclude a mortgagee whose interest is zero.)

In the case at bar the property to be retained in the Chapter 13 plan is debtor's principal residence. The value of the property is $250,000.00 or less, yet the value of the First Deed or Trust is at least $284,433.03 Thus, the secured interest of the Second Deed of Trust is zero since there is absolutely no equity to which the Second Deed of Trust can attach. Therefore, the Second Deed of Trust like that found in re Lam should be extinguished, treated as unsecured for purposes of the instant chapter 13 proceeding and discharged upon the completion of the plan terms.

### D. IN RE DEWSNUP IS DISTINGUISHED FROM LIEN\ STRIPPING IN THE INSTANT CASE

The chapter 7 case of Dewsnup v, Timm 502 U.S. 410, 112 S.Ct. 773, 116 I.Ed2d 903(1992) has no application to his chapter 13 case. The relevant cases are the chapter 13 cases which Movant/Debtor cites above which turn out on the many courts' interpretations if Section 1322(b)(2) of the Bankruptcy Code to mean that under Section 1332 (b)(2) a chapter 13 plan may modify the rights of secured claims, other than a claim secured only by a security interest in a real property is the debtor's principal Residence, and that this section in light of Section 506(a), does not preclude modification by a chapter 13 plan of the rights of holders of unsecured claims, to wit, junior mortgages which are completely unsecured.

To this end. Justice Scalia, in his dissent in Dewsnup points out the difference between lien stripping in that chapter 7 case and lien stripping in a chapter 13 case when he states that,

Respondents assume, for example, that a debtor in a chapter 13 cannot strip down a mortgage placed on the debtor's home, but that assumption may beg the very question the Court answers today. True. Section 1322(b)(2) provides that Chapter 13 filers may not "modify the rights of secured claims", that are "secured only by a security interest in real property that is the debtor's principal residence. But this can be and has been read, in light of section 506(a) to prohibit modification of the Mortgagee's rights only with respect to the operation of his claim that is deemed secured under the Code. See e.g. In re Hart 923 F.2d 1410, 1415 (CA 10 199); Wilson v. Commonwealth Mortgage Corp. 895 F/2d 123, 127 (CA3 1990). Dewsnup, 502 U.S. 410, 428, 112 S Ct 773, 784.

In Dever v. Internal Revenue Service 164 B.R. 132 (C.D. Cal 1994), Judge Fenning held that in spite of Dewsnup stripping an IRS lien on a principal residence is permissible in a chapter 11 case. The court noted that while under Dewsnup Chapter 7 debtors cannot use Section 506 to strip down liens on an under secured claim, the Supreme Court specifically reserved the question as to the applicability of its ruling in Dewsnup to cases under the reorganization chapters. 164 B.R. 132, 133. In Dever the court discussed the issue of lien stripping in Chapter 13 cases and cited the 10th Circuit Case of In re Hart wherein the Court reasoned:

> The dispositive issue in this case is whether Eastland's under secured loan may be bifurcated into two claims by applying general principals of section 506(a) to the mortgage and then protecting only the secured claim by provision of Section 1322(b). We believe it can. 923 F2d 1410, 1413 (10th Cir. 1991).

After citing In re Hart, in Dever the court went on the state that:

> If Section 506 does not permit debtors to bifurcate claims and strip down liens to their collateral value, and then all secured creditors would be freed of any concern, that debtors could reduce the amount of their liens while retaining property. If Congress did not intend to allow lien stripping in general in Chapter 13 cases, then why would it bother to draft the exclusionary language of Section 1322, as justice Stevens' concurring opinion in Nobleman emphasizes, the legislative history of Section 1322(b)(2) reflects Congressional desire to provide special protections to residential lenders. (Citations omitted) The threat must be lien stripping, because no other threat is evident.

Dever v. Internal Revenue Service 164 B.R. at 141.

//
//
//
//
//
//
//

## III.

## CONCLUSION

Clearly the second lien of Bank of America, is wholly unsecured as evidenced by the appraisal and points and authorities. Based on the foregoing, the Debtor respectfully requests:

1. That the Second lien of Bank of America be deemed an unsecured Claim during the life of the debtor's Chapter 13 plan, and the Chapter 13 Trustee treat and claim filed as an unsecured claim;
2. That upon completion of all plan payments and entry of discharge in this case Pursuant to 11 U.S.C. section 1328, the second lien of Bank of America or its successors, assigns etc. will be void and will not constitute an encumbrance on the real property described in the motion;
3. That upon that upon completion of all plan payments and upon entry of Discharge in this case. Bank of America, or its successors, assigns, etc, shall expeditiously reconvey the second lien and otherwise take such steps as are required to clear title, free of said lien, as to real property described in this motion.
4. The lien shall remain valid if the case is dismissed or converted to another Chapter.

Dated: 1/19/2010

Kent VanDerSchuit Esq.
Attorney for Debtors

DECLARATION OF CHRISTOPHER T. WEDEL IN SUPPORT OF MOTION TO AVOID THE SECOND LIEN OF BANK OF AMERICA

I, **Christopher T. Wedel**, do hereby declare that all of the following is true and Correct to the best of my personal knowledge and if called upon as a witness I could and Would competently testify to the truthfulness of all of the below statements.

1. I am one of the debtors in the above-captioned Chapter 13 Bankruptcy Case. Number 6:09-bk-41058
2. I filed bankruptcy to save my principal residence located at 2993 Cherry Laurel Lane, San Jacinto, CA 92582 (The Property")
3. The Property is worth no more than $140,000.00 based on a licensed California appraiser's Residential Appraisal Report reflecting current value.
4. The lien of the First Deed of Trust is currently held by IndyMac Mortgage Services The First Deed of trust is currently at least $265,823.65 based on the home loan statement dated 09/01/2009. (See Exhibit "D")
5. The Second lien is currently held by Bank of America. The amount Owing on the Second lien is currently at least $65,729.69 based on the Statement dated 08/28/2009.

I declare under penalty of perjury under the laws of the United States that the Foregoing is true and correct to the best of my knowledge. Executed this 1-19-10 at San Diego, California.

**Christopher T. Wedel**

**DECLARATION OF DELUX LAZICH IN SUPPORT OF MOTION TO AVOID JUNIOR LIEN OF BANK OF AMERICA**

I, **DELUX LAZICH**, a licensed appraiser, AR033347. Do hereby Declare that all the following is true and correct to the best of my personal Knowledge and if called upon as a witness I could and would competently testify To the truthfulness of all the below statements.

1. I am making this declaration in support of the Motion to Strip the Lien of BANK OF AMERICA.
2. On or about January 10, 2010, I appraised the real property located at 2993 Cherry Laurel Lane, San Jacinto, CA 92582 (hereinafter the "Subject Property").
3. I am familiar with the Uniform Standards of Professional Appraisal Practice as Promulgated by the Appraisal Standards Board of the Appraisal Foundation And I appraised the residence in conformity with these standards.
4. I personally inspected the interior and exterior of the subject property with the Properties listed as comparable in my appraisal report. I concluded that the Subject property was worth approximately $140,000.00 as of June 24, 2009. Attached hereto as Exhibit "B" is a true and correct of my appraisal of the Subject Property.

I declare under penalty of perjury under the laws of the State of California and The United States that the foregoing is true and correct.

Executed on 1/20/2010 at San Diego, CA.

Delux Lazich

Rodney A. Danielson
Chapter 13 Trustee
4361 Latham Street, Suite 270
Riverside, CA 92501

**VIA CERTIFIED MAIL**

**-INDYMAC FINANCIAL SERVICES**

Agent for Service of Process
**Corporation Service Company**
2730 GATEWAY OAKS DR STE 100
SACRAMENTO, CA 95833

**-BANK OF AMERICA CORPORATION**

Agent for Service of Process:
**CT Corporation System**
818 W. Seventh Street
Los Angeles, CA 90017

**PROOF OF SERVICE**

I am a citizen of the United States and employed in the County of San Diego. I am over The age of 18 years and not a party to the within action; my business address is 121 Broadway, Suite 323 San Diego, CA 92101

[X] On this date I served the foregoing document(s) on those parties. I am familiar with This firm's practice whereby the mail, after being placed in a designated area, is given the Appropriate postage and is deposited the same day with the United States Postal Service in The City of San Diego, California.

[ ] On this date I served the foregoing documents(s) on those parties as set forth Above by transmitting a true copy thereof **VIA FACSIMILE**, and also by placing a true and Correct copy thereof, enclosed in a sealed envelope and addressed in the above manner set Forth, in the designated area for outgoing mail. FAX NO: ( ) ___________.

[ ] **(By personal service)** I caused said foregoing documents(s) to be delivered by Had to the office or the residence of the addressee as shown above.

I declare under penalty of perjury the laws of the state of California that the foregoing is true and correct.

Dated: January 20, 2010 at Riverside, California.

By: ______________________
Brenda Mason

# EXHIBIT A

B6A (Official Form 6A) (12/07)

In re **Christopher Wedel,**
**Julie Wedel**

Debtors

Case No. **6:09-bk-34434-PC**

# SCHEDULE A - REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

**Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.**

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim." If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C - Property Claimed as Exempt.

| Description and Location of Property | Nature of Debtor's Interest in Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption | Amount of Secured Claim |
|---|---|---|---|---|
| **Single Family dwelling located at 2993 Cherry Lauerl Ln. San Jacinto CA 92582-3777** | | **C** | **250,000.00** | **8,154.00** |
| **Single family residential home located at 2993 Cherry Laurel Ln., San Jacinto, CA 92582-3777.** | | **C** | **0.00** | **65,727.00** |

Sub-Total > **250,000.00** (Total of this page)

Total > **250,000.00**

(Report also on Summary of Schedules)

**0** continuation sheets attached to the Schedule of Real Property

# EXHIBIT B

# Uniform Residential Appraisal Report

File # 11010-X1

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

Property Address 2993 CHERRY LAUREL LANE City SAN JACINTO State CA Zip Code 92582-3777
Borrower WEDEL Owner of Public Record WEDEL CHRISTOPHER T & JULIE County RIVERSIDE
Legal Description .21 ACRES M/L IN LOT 19 MB 397/084
Assessor's Parcel # 432-191-009 Tax Year 2009 R.E. Taxes $ 5,824.66
Neighborhood Name TAMERISK Map Reference 810-D2 Census Tract 435.10
Occupant [X] Owner [ ] Tenant [ ] Vacant Special Assessments $ 0.00 [ ] PUD HOA $ [ ] per year [ ] per month
Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)
Assignment Type [ ] Purchase Transaction [ ] Refinance Transaction [X] Other (describe) VALUE APPRAISAL DONE FOR OWNER
Lender/Client OWNER Address
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [ ] Yes [X] No
Report data source(s) used, offering price(s), and date(s). THE SUBJECT HAS NOT BEEN LISTED BY THE CURRENT OWNER. DATA SOURCES USED WERE LOCAL MLS, WIN 2 DATA, NDC DATA AND PUBLIC RECORDS.

**CONTRACT**

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $ N/A Date of Contract Is the property seller the owner of public record? [ ] Yes [ ] No Data Source(s)
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No
If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

**Note: Race and the racial composition of the neighborhood are not appraisal factors.**

| Neighborhood Characteristics | One-Unit Housing Trends | One-Unit Housing | Present Land Use % |
|---|---|---|---|
| Location [ ] Urban [X] Suburban [ ] Rural | Property Values [ ] Increasing [ ] Stable [X] Declining | PRICE $ (000) / AGE (yrs) | One-Unit 70 % |
| Built-Up [X] Over 75% [ ] 25-75% [ ] Under 25% | Demand/Supply [ ] Shortage [X] In Balance [ ] Over Supply | 110 Low 3 | 2-4 Unit 0 % |
| Growth [ ] Rapid [X] Stable [ ] Slow | Marketing Time [ ] Under 3 mths [X] 3-6 mths [ ] Over 6 mths | 260 High 46 | Multi-Family 0 % |
| | | 160 Pred. 5 | Commercial 5 % |
| | | | Other 25 % |

Neighborhood Boundaries SUBJECT NEIGHBORHOOD BOUNDARIES INCLUDE: NATURAL OPEN SPACE NORTH, HWY 74 SOUTH, WARREN RD WEST AND SANDERSON AVE EAST.
Neighborhood Description THE SUBJECT IS IN A MIXED USE AREA CONSISTING OF MOSTLY CONFORMING TRACT DEVELOPMENT SFR'S WITH POCKETS OF COMMERCIAL STRIPS AND VACANT LAND SCATTERED THROUGHOUT. THE HOMES ARE OF AVERAGE TO GOOD QUALITY AND DISPLAY SIMILAR LEVELS OF MAINTENANCE & APPEAL FOR THE LOCATION THE AREA IS IN CLOSE PROXIMITY TO ALL NEIGHBORHOOD SUPPORTING FACILITIES. (SCHOOL, SHOPPING, ETC.)
Market Conditions (including support for the above conclusions) PER EXISTING LISTINGS IN THE NEIGHBORHOOD, EXPOSURE TIME APPEARS TO BE FROM BETWEEN 3-6 MONTHS FOR SIMILAR PROPERTIES. ALL FORMS OF LENDING APPEAR TO BE AVAILABLE WITH CONVENTIONAL BEING MOST PREVALENT. CURRENTLY, PROPERTY VALUES SEEM TO HAVE A SLIGHT DECLINE IN THE MARKET, WITH INTEREST RATES RANGING FROM 4.5%-7.5% IN THE MARKET. THIS RECENT DECLINE IS MARKET DRIVEN AND NOT ATTRIBUTED TO ANY OTHER OUTSIDE ADVERSE PHYSICAL FACTORS.

**SITE**

Dimensions 55.16 X 35.38 X 92 X 80.16 X 117 Area 9,147 (.21 AC) Shape IRREGULAR View HILLS
Specific Zoning Classification 1 (PER FARES) Zoning Description ALLOWS FOR SINGLE FAMILY RESIDENCE
Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)
Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements - Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | [ ] | Water | [X] | [ ] | Street ASPHALT | [X] | [ ] |
| Gas | [X] | [ ] | Sanitary Sewer | [X] | [ ] | Alley NONE | [ ] | [ ] |

FEMA Special Flood Hazard Area [ ] Yes [X] No FEMA Flood Zone X FEMA Map # 06065C1470G FEMA Map Date 8/28/2008
Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No If Yes, describe
NONE APPARENT OR DISCLOSED TO APPRAISER. I HAVE NOT BEEN PROVIDED WITH ANY DOCUMENTATION REVEALING ANY PHYSICAL DEFICIENCIES AND HAVE REPORTED ONLY APPARENT ADVERSE CONDITIONS. BORROWER MAY NOT RELY ON THIS REPORT FOR STRUCTURAL CONDITIONS THAT MAY EXIST AND IS ENCOURAGED TO OBTAIN A HOME INSPECTION BY A PROFESSIONAL HOME INSPECTOR TO DETERMINE IF PROBLEMS EXIST. SEE LIMITING CONDITION #5.

**IMPROVEMENTS**

| General Description | Foundation | Exterior Description materials/condition | Interior materials/condition |
|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | [X] Concrete Slab [ ] Crawl Space | Foundation Walls CONCRETE/GOOD | Floors CRPT/TILE/GOOD |
| # of Stories 1 | [ ] Full Basement [ ] Partial Basement | Exterior Walls STUCCO/GOOD | Walls DRYWALL/GOOD |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | Basement Area NO sq.ft. | Roof Surface TILE/GOOD | Trim/Finish WOOD/GOOD |
| [X] Existing [ ] Proposed [ ] Under Const. | Basement Finish NO % | Gutters & Downspouts OVERHANG/AVG | Bath Floor TILE/AVG |
| Design (Style) SINGLE STORY | [ ] Outside Entry/Exit [ ] Sump Pump | Window Type VINYL SLIDER/GD | Bath Wainscot FIBERGLASS/AVG |
| Year Built 2007 | Evidence of [ ] Infestation NONE NOT | Storm Sash/Insulated NO | Car Storage [ ] None |
| Effective Age (Yrs) 1 YR | [ ] Dampness [ ] Settlement | Screens ALUM CASED/AVG | [X] Driveway # of Cars 2 |
| Attic [ ] None | Heating [X] FWA [ ] HWBB [ ] Radiant | Amenities [ ] Woodstove(s) # | Driveway Surface CONCRETE |
| [ ] Drop Stair [ ] Stairs | [ ] Other Fuel GAS | [X] Fireplace(s) # 1 [X] Fence BLOCK | [X] Garage # of Cars 3 |
| [ ] Floor [X] Scuttle | Cooling [X] Central Air Conditioning | [X] Patio/Deck SLAB [X] Porch COV | [ ] Carport # of Cars |
| [ ] Finished [ ] Heated | [ ] Individual [ ] Other | [ ] Pool [ ] Other | [X] Att. [ ] Det. [ ] Built-in |

Appliances [X] Refrigerator [X] Range/Oven [X] Dishwasher [X] Disposal [X] Microwave [ ] Washer/Dryer [X] Other (describe) FAN HOOD
Finished area **above** grade contains: 7 Rooms 4 Bedrooms 3 Bath(s) 2,367 Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.). VINYL WINDOWS, COVERED PORCH, STAMPED CONCRETE PATIO

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). THE SUBJECT IS OF GOOD QUALITY CONDITION REFLECTING SIMILAR MAINTENANCE AND DISPLAYING SIMILAR APPEAL FOR LOCATION. NO CONDITIONS OR REQUIREMENTS NEEDED OR NOTED IN THIS REPORT. UTILITIES WERE ON AT TIME OF INSPECTION AND ARE IN WORKING ORDER. TAX ROLLS INDICATE 2,367 SQ. FT. AND PHYSICAL INSPECTION CONFIRMED 2,367 SQ. FT. THE PUBLIC RECORD LISTS THE SUBJECTS MODEL AS HAVING 3 BEDROOMS BUT INSPECTION REVEALED 4 BEDROOMS.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No If Yes, describe
NONE APPARENT OR DISCLOSED TO APPRAISER. I HAVE NOT BEEN PROVIDED WITH ANY DOCUMENTATION REVEALING ANY PHYSICAL DEFICIENCIES AND HAVE REPORTED ONLY APPARENT ADVERSE CONDITIONS. BORROWER MAY NOT RELY ON THIS REPORT FOR STRUCTURAL CONDITIONS THAT MAY EXIST AND IS ENCOURAGED TO OBTAIN A HOME INSPECTION BY A PROFESSIONAL HOME INSPECTOR TO DETERMINE IF PROBLEMS EXIST. SEE LIMITING CONDITION #5.
Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No If No, describe

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

File # 11010-X1

There are 4 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 119,900 to $ 155,000 .

There are 18 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 110,000 to $ 174,500 .

**SALES COMPARISON APPROACH**

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 2993 CHERRY LAUREL LANE SAN JACINTO, CA 92582-3777 | 3054 CROOKED BRANCH WAY SAN JACINTO APN#432-210-034 | | 2968 SILENT SPRINGS LANE SAN JACINTO APN#432-222-020 | | 342 GLADIOLUS WAY SAN JACINTO APN#432-242-009 | |
| Proximity to Subject | | 0.40 miles | | 0.32 miles | | 0.19 miles | |
| Sale Price | $ N/A | | $ 140,000 | | $ 110,000 | | $ 145,000 |
| Sale Price/Gross Liv. Area | $ N/A sq.ft. | $ 59.15 sq.ft. | | $ 46.47 sq.ft. | | $ 59.94 sq.ft. | |
| Data Source(s) | | DOC# 457731 DOM 16 | | DOC# 440199 DOM 163 | | DOC# 582290 DOM 23 | |
| Verification Source(s) | | FARES/NDC/MLS# I09068674 | | FARES/NDC/MLS# I09019000 | | FARES/NDC/MLS# I09094737 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | CONVENTIONA NONE SPECIFII | | CONVENTIONA NONE SPECIFII | | CONVENTIONA NONE SPECIFII | |
| Date of Sale/Time | | COE 9/2/09 | | COE 8/24/09 | | COE 11/10/09 | |
| Location | SUBURBAN | SUBURBAN | | SUBURBAN | | SUBURBAN | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 9,147 (.21 AC) | 7,405 | | 8,276 | | 7,405 | |
| View | HILLS | HILLS | | HILLS | | HILLS | |
| Design (Style) | SINGLE STORY | SINGLE STORY | | SINGLE STORY | | SINGLE STORY | |
| Quality of Construction | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Actual Age | 3 YRS | 4 YRS | | 4 YRS | | 5 YRS | |
| Condition | GOOD | GOOD | | GOOD | | GOOD | |
| Above Grade Room Count (Total / Bdrms. / Baths) | 7 / 4 / 3 | 7 / 4 / 3 | | 7 / 4 / 3 | | 7 / 4 / 3 | |
| Gross Living Area | 2,367 sq.ft. | 2,367 sq.ft. | | 2,367 sq.ft. | | 2,419 sq.ft. | |
| Basement & Finished | NO | NO | | NO | | NO | |
| Rooms Below Grade | NO | NO | | NO | | NO | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | FAU/CENTRAL | FAU/CENTRAL | | FAU/CENTRAL | | FAU/CENTRAL | |
| Energy Efficient Items | NONE | NONE | | NONE | | NONE | |
| Garage/Carport | 3 CAR TANDEM | 3 CAR TANDEM | | 3 CAR TANDEM | | 3 CAR TANDEM | |
| Porch/Patio/Deck | CV PC & SLB P' | CV PC & SLB P' | | CV PC & SLB P' | | CV PC & SLB P' | |
| POOL & SPA | NONE | NONE | | NONE | | NONE | |
| UPGRADES | UPGRADES | UPGRADES | | UPGRADES | | UPGRADES | |
| ORIGINAL LIST PRICE | NOT LISTED | $141,900 | | $107,777 | | $124,000 | |
| Net Adjustment (Total) | | ☐ + ☐ - | $ | ☐ + ☐ - | $ | ☐ + ☐ - | $ |
| Adjusted Sale Price of Comparables | | Net Adj. % Gross Adj. % | $ 140,000 | Net Adj. % Gross Adj. % | $ 110,000 | Net Adj. % Gross Adj. % | $ 145,000 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data Source(s) FARES/NDC DATA/MLS

My research ☒ did ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.

Data Source(s) FARES/NDC DATA/MLS

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | PRIOR SALE 3/29/07 | TRANSFER 4/8/09 | PRIOR SALE 8/21/06 | TRANSFER 7/2/09 |
| Price of Prior Sale/Transfer | 327,000 | 321,134 | 342,500 | 115,676 |
| Data Source(s) | FARES/NDC DATA/MLS | FARES/NDC DATA/MLS | FARES/NDC DATA/MLS | FARES/NDC DATA/MLS |
| Effective Date of Data Source(s) | 1/10/10 | 1/10/10 | 1/10/10 | 1/10/10 |

Analysis of prior sale or transfer history of the subject property and comparable sales THE SUBJECT PROPERTY WAS PURCHASED FROM THE BUILDER ON THE DATE LISTED ABOVE. MAJOR APPRECIATION OCCURRED IN THE YEARS 2000-2005 IN THE SAN JACINTO AREA. SOME OF THE COMPARABLES USED HAVE TRANSFERRED IN THE PAST 12 MONTHS THE RATE OF DECLINE OF HOME VALUES IN THE SUBJECTS MARKET AREA IS APPROXIMATELY 13% OVER THE LAST 12 MONTHS BUT THE RATE OF DECLINE FOR HOMES SIMILAR TO SUBJECT OVER THE PAST 12 MONTHS IN THE SUBJECTS NEIGHBORHOOD IS APPROXIMATELY 0% (AS SHOWN ON THE MARKET CONDITIONS ADDENDUM FORM 1004MC) . THERE WE NO INTERESTED PARTY CONTRIBUTIONS, CONCESSIONS, OR BUILDERS INCENTIVES FOUND THAT WERE UNUSUAL OR EXCESSIVE AND IMPACT THE FINAL ESTIMATION OF VALUE.

Summary of Sales Comparison Approach MOST WEIGHT IS GIVEN TO COMP# 1 FOR SIMILAR DWELLING SQUARE FOOTAGE, ROOM COUNT, LOCATION, AGE AND LOT SQUARE FOOTAGE. COMPS# 2 & 3 ARE CHOSEN FOR BEING MOST SIMILAR IN LOCATION, CONDITION, APPEAL. ALL COMPS ARE ALSO FOUND TO BE THE MOST SIMILAR AND THE MOST RECENT IN SALES INFORMATION AVAILABLE. THE SUBJECT PROPERTY APPEARS TO BE FULLY COMPATIBLE WITH THE AREA IN WHICH IT IS LOCATED. LOT SQUARE FOOTAGE ADJUSTMENTS ARE MADE AT $ 1.00 PER FOOT WHEN DIFFERENCE IS GREATER THAN 2,000 SQ. FT. NO TIME ADJUSTMENTS GIVEN TO COMPARABLES THAT HAVE CLOSED ESCROW MORE THAN 90 DAYS PRIOR TO INSPECTION DUE TO THE RATE OF DECLINE FOR HOMES SIMILAR TO THE SUBJECT OVER THE PAST 12 MONTHS IN THE SUBJECTS NEIGHBORHOOD I APPROXIMATELY 0% (AS SHOWN ON THE MARKET CONDITIONS ADDENDUM FORM 1004MC). THE SUBJECTS NEIGHBORHOOD IS BORDERED BY DAIRY FARMS WITH COWS ON THREE SIDES. THE SUBJECT AND ALL OF THE COMPARABLES USED WERE SUBJECT TO VARYING DEGREES OF ODOR FROM THESE DAIRY FARMS DEPENDING ON WIND DIRECTION. NO LOCATION ADJUSTMENTS WERE MADE DUE TO ALL OF THE COMPARABLES AND THE SUBJECT HAVING THE SAME EXTERNAL OBSOLESCENCE.

Indicated Value by Sales Comparison Approach $ 140,000

**RECONCILIATION**

**Indicated Value by: Sales Comparison Approach $** 140,000 **Cost Approach (if developed) $** 416,701 **Income Approach (if developed) $**

ADEQUATE MARKET SALES WERE LOCATED TO MARK THE VALUE OF THE SUBJECT PROPERTY. THE DIRECT SALES COMPARISON IS GIVEN THE GREATEST CONSIDERATION WITH ADDITIONAL SUPPORT PROVIDED BY THE COST APPROACH. THE FINAL VALUE OF THE SUBJECT PROPERTY IS LOWER THE PREDOMINATE VALUE FOR THE AREA DUE TO IT BEING SMALLER IN GROSS LIVING AREA THAN AVERAGE HOWEVER, FALLS WITHIN THE MARKETS TYPICAL VALUE RANGE.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

**Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $** 140,000 **, as of** 1/10/2010 **, which is the date of inspection and the effective date of this appraisal.**

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

File # 11010-X1

## ADDITIONAL COMMENTS

THE INITIAL COMPARABLE SALE SEARCH FOCUSED ON SALES, LISTINGS, AND PENDING SALES WITH TRANSACTION DATES WITHIN THE PAST 3 MONTHS, LOCATED WITHIN 1 MILE FROM THE SUBJECT, WITHIN A 15% GROSS LIVING AREA DIFFERENCE, SIMILAR SITE SIZE, SIMILAR AGE WITHIN A 10 YEAR RANGE, AND SIMILAR IN DESIGN AND STYLE. THE INITIAL SEARCH RESULTED IN 0 CLOSED SALES, 3 ACTIVE LISTING, AND 1 PENDIN SALE. OF THESE FOUND 2 OF THE ACTIVE LISTINGS WERE CONSIDERED TO BE COMPARABLE TO THE SUBJECT AND USED IN THE REPORT. DUE TO THE LACK OF CLOSED SALES WITHIN THIS TIME PERIOD, THE CLOSE OF ESCROW PARAMETER WAS THEN EXTENDED TO 6 MONTHS. THIS RESULTED IN 4 CLOSED SALES WHICH WERE CONSIDERED COMPARABLE TO THE SUBJECT AND USED IN THIS REPORT.

MOST WEIGHT IS GIVEN TO COMPARABLE #1 DUE TO SIMILARITIES IN GROSS LIVING AREA, ROOM COUNT, AND DESIGN AND STYLE. ALTHOUGH MOST WEIGHT IS GIVEN TO THIS COMPARABLE, THE FINAL ESTIMATION OF VALUE FOR THE SUBJECT DOES NOT EQUAL THE ADJUSTED VALUE OF COMPARABLE #1 DUE TO WEIGHT GIVEN TO THE OTHER CLOSED SALES AND LISTINGS USED IN THE REPORT.

THE LEAST AMOUNT OF WEIGHT IS GIVEN TO COMPARABLE #4 DUE TO DIFFERENCES IN GROSS LIVING AREA.

THE SUBJECTS DEVELOPMENT AND NEIGHBORING DEVELOPMENT IS SURROUNDED BY DAIRY FARMS. THE WEST, NORTH AND SOUTH PERIMETER OF THE SUBJECTS DEVELOPMENT AND NEIGHBORING DEVELOPMENT ARE BORDERED BY A DAIRY FARM. ALL OF THE HOMES USED IN THIS REPORT ARE SUBJECT TO THE SAME EXTERNAL OBSOLESCENCE AND THEREFORE NO LOCATION ADJUSTMENT WAS MADE TO THE COMPARABLES.

DUE TO THE AMOUNT OF FORECLOSED HOMES AND DISTRESSED SALES, THE HOME VALUES IN THE SUBJECTS NEIGHBORHOOD HAVE DECREASED FAR BELOW THE COST TO BUILD. THIS IS WHY THE COST APPROACH VALUE IS MUCH HIGHER THAN THE FINAL ESTIMATED VALUE OF THE SUBJECT.

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value) SALES COMPARISON APPROACH IS CONSIDERED THE MOST RELIABLE METHOD OF DETERMINING THE "MARKET VALUE". COST APPROACH IS GIVEN NO WEIGHT IN ESTABLISHING MARKET VALUE & SHOULD NOT BE USED FOR FIRE INSURAI CONSIDERATIONS.(cost approach not reliable for insurance) EXACT REPLACEMENT COST SHOULD BE OBTAINED FROM A PROFESSIONAL FIRE INSURANCE COMPANY. SITE VALUE IS BASED ON ABSTRACTION METHOD. LAND TO VALUE RATIO APPEARS TO BE TYPICAL.

ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW

Source of cost data BUILDING-COST.NET OR MARKET COSTS/LOCAL C

Quality rating from cost service GOOD Effective date of cost data CURRENT

Comments on Cost Approach (gross living area calculations, depreciation, etc.) SEE ATTACHED SKETCH FOR SUBJECTS FLOOR PLAN. LAND TO VALUE RATIO APPEARS TO BE TYPICAL FOR FOR THIS AREA, AGE, SITE, QUALITY & CONDITION OF DWELLING. 1-6 MONTH MARKETING TIME APPEARS REASONABLE FOR SUBJECT. COST APPROACH IS BASED ON LOCAL CONTRACTORS & THEIR PROFIT (TO BUILD) WITH A SMALL PORTION TAKEN FROM BUILDING-COST.NET. BOTH BUILDING COST AND BUILDERS PROFIT IS TOTALED TOGETHER FOR TOTAL COST PER SQ. FT.

Estimated Remaining Economic Life (HUD and VA only) 59 Years

| Item | | | | Value |
|---|---|---|---|---|
| OPINION OF SITE VALUE | | | | =$ 10,000 |
| DWELLING | 2,367 Sq.Ft. @ $ 159.00 | | | =$ 376,353 |
| | NO Sq.Ft. @ $ | | | =$ |
| COVERED PORCH & SLAB PATIO | | | | =$ 8,000 |
| Garage/Carport | 560 Sq.Ft. @ $ 25.00 | | | =$ 14,000 |
| Total Estimate of Cost-New | | | | =$ 398,353 |
| Less | Physical | Functional | External | |
| Depreciation | 6,652 | | | =$( 6,652) |
| Depreciated Cost of Improvements | | | | =$ 391,701 |
| "As-is" Value of Site Improvements | | | | =$ 15,000 |
| INDICATED VALUE BY COST APPROACH | | | | =$ 416,701 |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

Estimated Monthly Market Rent $ X Gross Rent Multiplier = $ Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

Total number of phases Total number of units Total number of units sold

Total number of units rented Total number of units for sale Data source(s)

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No If Yes, date of conversion.

Does the project contain any multi-dwelling units? ☐ Yes ☐ No Data Source

Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

File # 11010-X1

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

File # 11010-X1

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

# Uniform Residential Appraisal Report

File # 11010-X1

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

**APPRAISER**

Signature [signature]
Name DELUX LAZICH
Company Name DELUX APPRAISALS, INC.
Company Address 853 POHL PL, VISTA CA 92083
Telephone Number (760) 519-7880
Email Address delux2323@cox.net
Date of Signature and Report 1/10/2010
Effective Date of Appraisal 1/10/2010
State Certification # AR033347
or State License # 
or Other (describe) ______ State # ______
State CA
Expiration Date of Certification or License 3/11/2010

ADDRESS OF PROPERTY APPRAISED
2993 CHERRY LAUREL LANE
SAN JACINTO, CA 92582-3777

APPRAISED VALUE OF SUBJECT PROPERTY $ 140,000

**LENDER/CLIENT**

Name
Company Name OWNER
Company Address
Email Address

**SUPERVISORY APPRAISER (ONLY IF REQUIRED)**

Signature
Name
Company Name
Company Address
Telephone Number
Email Address
Date of Signature
State Certification #
or State License #
State
Expiration Date of Certification or License

SUBJECT PROPERTY

- ☐ Did not inspect subject property
- ☐ Did inspect exterior of subject property from street
  Date of Inspection
- ☐ Did inspect interior and exterior of subject property
  Date of Inspection

COMPARABLE SALES

- ☐ Did not inspect exterior of comparable sales from street
- ☐ Did inspect exterior of comparable sales from street
  Date of Inspection

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 11010-X1 Page #7

# Uniform Residential Appraisal Report

File # 11010-X1

SALES COMPARISON APPROACH

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 2993 CHERRY LAUREL LANE SAN JACINTO, CA 92582-3777 | 2826 VIOLET DRIVE SAN JACINTO APN#432-252-028 | | 2780 NEWCASTLE WAY SAN JACINTO APN#432-250-018 | | 2829 EUREKA ROAD SAN JACINTO APN#432-234-013 | |
| Proximity to Subject | | 0.39 miles | | 0.47 miles | | 0.25 miles | |
| Sale Price | $ N/A | | $ 130,000 | | $ 145,000 | | $ 155,000 |
| Sale Price/Gross Liv. Area | $ N/A sq.ft. | $ 58.51 sq.ft. | | $ 59.94 sq.ft. | | $ 64.08 sq.ft. | |
| Data Source(s) | | DOC# 487270 DOM 7 | | MLS# T09131790 DOM 18 | | MLS# E09110594 DOM 107 | |
| Verification Source(s) | | FARES/NDC/MLS# I09086572 | | MULTIPLE LISTING SERVICE | | MULTIPLE LISTING SERVICE | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | CONVENTIONA NONE SPECIFIE | | PENDING SALE | | ACTIVE LISTING | |
| Date of Sale/Time | | COE 9/18/09 | | OFF MKT 1/4/10 | | LD 9/25/09 | |
| Location | SUBURBAN | SUBURBAN | | SUBURBAN | | SUBURBAN | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 9,147 (.21 AC) | 7,405 | | 7,405 | | 7,405 | |
| View | HILLS | HILLS | | HILLS | | HILLS | |
| Design (Style) | SINGLE STORY | SINGLE STORY | | SINGLE STORY | | SINGLE STORY | |
| Quality of Construction | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Actual Age | 3 YRS | 5 YRS | | 5 YRS | | 5 YRS | |
| Condition | GOOD | GOOD | | GOOD | | GOOD | |
| Above Grade | Total / Bdrms. / Baths | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Room Count | 7 / 4 / 3 | 7 / 3 / 3 | | 78 / 4 / 3 | | 7 / 4 / 3 | |
| Gross Living Area | 2,367 sq.ft. | 2,222 sq.ft. | +6,525 | 2,419 sq.ft. | | 2,419 sq.ft. | |
| Basement & Finished | NO | NO | | NO | | NO | |
| Rooms Below Grade | NO | NO | | NO | | NO | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | FAU/CENTRAL | FAU/CENTRAL | | FAU/CENTRAL | | FAU/CENTRAL | |
| Energy Efficient Items | NONE | NONE | | NONE | | NONE | |
| Garage/Carport | 3 CAR TANDEM | 2 GARAGE | +2,500 | 2 GARAGE | +2,500 | 2 GARAGE | +2,500 |
| Porch/Patio/Deck | CV PC & SLB P | CV PC & SLB P | | CV PC & SLB P | | CV PC & SLB P | |
| POOL & SPA | NONE | NONE | | NONE | | NONE | |
| UPGRADES | UPGRADES | UPGRADES | | UPGRADES | | UPGRADES | |
| ORIGINAL LIST PRICE | NOT LISTED | $124,900 | | $145,000 | | $155,000 | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 9,025 | ☒ + ☐ - | $ 2,500 | ☒ + ☐ - | $ 2,500 |
| Adjusted Sale Price of Comparables | | Net 6.9 % Gross 6.9 % | $ 139,025 | Net 1.7 % Gross 1.7 % | $ 147,500 | Net 1.6 % Gross 1.6 % | $ 157,500 |

SALE HISTORY

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | PRIOR SALE 3/29/07 | TRANSFER 7/28/09 | TRANSFER 12/9/09 | PRIOR SALE 5/27/05 |
| Price of Prior Sale/Transfer | 327,000 | 107,000 | 133,000 | 326,500 |
| Data Source(s) | FARES/NDC DATA/MLS | FARES/NDC DATA/MLS | FARES/NDC DATA/MLS | FARES/NDC DATA/MLS |
| Effective Date of Data Source(s) | 1/10/10 | 1/10/10 | 1/10/10 | 1/10/10 |

Analysis of prior sale or transfer history of the subject property and comparable sales PRIOR SALE OF SUBJECT LISTED ABOVE. SOME OF THE COMPARABLES USED HAVE TRANSFERRED IN THE LAST 12 MONTHS. COMPARABLES USED THAT LIST A "TRANSFER" DATE WERE BANK OWNED FORECLOSURES AND THE TRANSFER DATE AND AMOUNT, IF LISTED, IS SUPPLIED. THE COMPARABLES THAT HAVE "PRIOR SALE" LISTED WERE NOT BANK OWNED SALES BUT WERE TYPICAL TRANSACTIONS OR SHORT SALES AND NOT A SALE OF A FORECLOSED HOME. DUE TO THE CURRENT MARKET CONDITIONS, REO'S DO COMPETE WITH THE SUBJECT AND ARE NOT EXCLUDED AS A VIABLE COMPARABLE OR LISTING.

ANALYSIS / COMMENTS

Analysis/Comments COMPARABLE #5 IS A PENDING SALE AND COMPARABLE #6 IS AN ACTIVE LISTING IN THE SUBJECTS MARKET AREA. THERE WERE NO NEGOTIATION ADJUSTMENTS GIVEN TO THESE COMPARABLES DUE TO THE SALES/LIST PRICE RATIO OF HOMES SIMILAR TO THE SUBJECT AT 100% OR ABOVE. ( AS SHOWN ON THE FORM 1004MC)

-REVIEW COMMENT:
IN THE EVENT THAT THIS REPORT IS TO BE REVIEWED BY A LICENSED OR UNLICENSED INDIVIDUAL, ALL ASPECTS OF STANDARDS RULE 3 AS NOTED IN USPAP, SHALL BE ADHERED TO OR THIS REPORT SHALL BE NULL AND VOID.

-ANY ADDITIONAL REQUESTS/CONDITIONS MUST BE SUBMITTED IN WRITING AND MAY INCUR ADDITIONAL COSTS FOR SERVICES RENDERED.-

Freddie Mac Form 70 March 2005 Fannie Mae Form 1004 March 2005

Form 1004.(AC) — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Market Conditions Addendum to the Appraisal Report

File No. 11010-X1

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

Property Address 2993 CHERRY LAUREL LANE City SAN JACINTO State CA ZIP Code 92582-3777

Borrower WEDEL

**Instructions:** The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

MARKET RESEARCH & ANALYSIS

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 11 | 6 | 1 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Absorption Rate (Total Sales/Months) | 1.83 | 2.00 | 0.33 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Total # of Comparable Active Listings | 21 | 2 | 2 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | 11.5 | 1.0 | 6.1 | ☐ Declining | ☐ Stable | ☒ Increasing |
| **Median Sale & List Price, DOM, Sale/List %** | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
| Median Comparable Sale Price | 143,000 | 138,250 | 145,000 | ☒ Increasing | ☐ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | 46 | 72 | 23 | ☒ Declining | ☐ Stable | ☐ Increasing |
| Median Comparable List Price | 155,000 | 139,950 | 132,450 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Median Comparable Listings Days on Market | 54 | 58 | 21 | ☒ Declining | ☐ Stable | ☐ Increasing |
| Median Sale Price as % of List Price | 95% | 101% | 116% | ☒ Increasing | ☐ Stable | ☐ Declining |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? ☒ Yes ☐ No | | | | ☐ Declining | ☒ Stable | ☐ Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.). SELLER CONTRIBUTIONS HAVE INCREASED IN THE SOUTHERN CALIFORNIA AREA, IN GENERAL OVER THE PAST 12 MONTHS. SELLERS CONCESSIONS ARE TYPICAL IN THE MARKET AND ARE USUALLY USED TOWARDS CLOSING COSTS. CURRENT SELLER CONTRIBUTIONS ARE BETWEEN 3% TO 5%, AND ARE TYPICAL IN THE CURRENT MARKET CONDITIONS. THERE ARE NO NEW DEVELOPMENTS IN THE SUBJECTS MARKET AREA SO BUILDERS INCENTIVES ARE NON-EXISTENT.

Are foreclosure sales (REO sales) a factor in the market? ☒ Yes ☐ No If yes, explain (including the trends in listings and sales of foreclosed properties). THE NUMBER OF FORECLOSURE, OR REO, SALES IN THE SUBJECTS MARKET AREA HAVE INCREASED SIGNIFICANTLY OVER THE PAST 12 MONTHS. A TYPICAL BUYER IN THIS MARKET WOULD CONSIDER THESE HOMES WHEN MAKING A DECISION ABOUT PURCHASING A HOME. BUYERS TEND TO ACCEPT REPAIRS NEEDED AND THE EXTRA TIME NEEDED TO CLOSE ESCROW IN EXCHANGE FOR A LOW PRICE. IN THE SUBJECTS MARKET AREA OVER HALF OF THE SALES OVER THE PAST 12 MONTHS AND OVER HALF OF THE CURRENT LISTINGS ARE BANK OWNED PROPERTIES. REO'S ARE PERSISTENTLY PRESENT AND COMPETING WITH AND THUS HAVING AN IMPACT ON THE MARKET.

Cite data sources for above information. MLS, CORE LOGIC, NDC DATA, GO TITLE PROPERTY PROFILES.

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions. IN SUMMARY, THE CONCLUSIONS ASCERTAINED FOR THIS MARKET CONDITION ADDENDUM, SHOW THAT THE SUBJECTS DIRECT MARKET AREA HAS HAD A LOT OF REO SALES WITH REGARDS TO THE SUBJECT COMPARABLES IN SIZE, AGE AND CONDITION. THERE WAS AN ADEQUATE NUMBER OF COMPARABLE SALES IN THE SUBJECT AREA OVER THE LAST YEAR, WHICH INDICATES A SOLID MARKET AREA. SHORT SALES HAVE BEEN MORE SUCCESSFUL IN RECENT MONTHS AND HAVE CAUSED A DECLINE IN BANK OWNED TRANSACTIONS AND FORECLOSURES. THE CONCLUSIONS MADE ARE SUPPORTED AND DERIVED USING PERSONAL ANALYSIS AND THE MLS STATISTICS. PROPERTIES USED IN THIS ANALYSIS WOULD BE COMPARABLE TO THE SUBJECT PROPERTY AND WOULD ATTRACT THE SAME BUYER AS THE SUBJECT PROPERTY. ALTHOUGH SOME MARKET DATA SHOWS IMPROVEMENT, THE OVERALL MARKET AREA FOR THE SUBJECT IS STILL IN A STATE OF DECLINE. THE MEDIAN SALES TO LIST PRICE PERCENTAGES ARE DERIVED FRO ANALYZING ALL OF THE SALES IN THE RESPECTIVE PERIOD AND REPORTING THE MEDIAN SALES TO LIST PRICE RATIO OF ONLY THOSE SALES. IT IS NOT A NUMBER CALCULATE BY DIVIDING THE MEDIAN PRICE INTO THE MEDIAN LIST PRICE OF EACH PERIOD DUE TO EXPIRED OR CANCELLED LISTINGS THAT COULD HAVE BEEN LISTED AT AN AMOUNT TH WAS TOO HIGH FOR THE MARKET AND HAD NO OFFERS.

CONDO/CO-OP PROJECTS

**If the subject is a unit in a condominium or cooperative project, complete the following:** **Project Name:**

| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab.Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project? ☐ Yes ☐ No If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

APPRAISER

| | |
|---|---|
| Signature | Signature |
| Appraiser Name DELUX LAZICH | Supervisory Appraiser Name |
| Company Name DELUX APPRAISALS, INC. | Company Name |
| Company Address 853 POHL PL, VISTA CA. 92083 | Company Address |
| State License/Certification # AR033347 State CA | State License/Certification # State |
| Email Address delux2323@cox.net | Email Address |

**Supplemental Addendum**

File No.  11010-X1

| | | | |
|---|---|---|---|
| Borrower/Client  WEDEL | | | |
| Property Address  2993 CHERRY LAUREL LANE | | | |
| City  SAN JACINTO | County  RIVERSIDE | State  CA | Zip Code  92582-3777 |
| Lender  OWNER | | | |

1/10/2010

SKETCH FOR THIS APPRAISAL SHOWS APPROXIMATE DIMENSIONS OF DWELLING, SIZE HAS POSSIBLE STANDARD OF DEVIATION GREATER OR LESS THEN SKETCH'S GROSS LIVING AREA. SIZE IS NOT GUARANTEED, DUE TO ROUNDING TO THE NEAREST SQ.FT. ON  THE EXTERIOR & INTERIOR WALLS WHEN NECESSARY. (AS NOTED ON LIMITING CONDITION #2 ON PAGE 4 OF THE U.R.A.R)

--CONDITION OF APPRAISAL:  ALTHOUGH A WALK-THROUGH INSPECTION HAS BEEN PREFORMED, THE APPRAISER IS NOT AN EXPERT IN THE FIELD OF BUILDING INSPECTION, STRUCTURAL ENGINEERING, PEST CONTROL, HAZARDOUS WASTE DETECTION, AND SOILS ENGINEERING. NO WARRANTY IS GIVEN IN REGARDS TO THOSE ELEMENTS AND EXPERTS IN THE RELATED FIELDS SHOULD BE CONSULTED IF DESIRED. THE APPRAISAL WAS PREPARED FOR LENDING PURPOSES AND DOES NOT CONSTITUTE AN EXPERT INSPECTION OF THE PROPERTY. RELIANCE ON THIS APPRAISAL IS LIMITED TO THE NAMED CLIENT. VALUATION IS BASED ON CURRENT MARKET CONDITIONS AS OF THE DATE OF INSPECTION OF THE SUBJECT PROPERTY. THE APPRAISER ASSUMES NO RESPONSIBILITY FOR DETRIMENTAL PHYSICAL, FUNCTIONAL, EXTERNAL OR ECONOMIC FACTORS TRANSPIRING AFTER THE DATE OF INSPECTION.  THE DIGITAL SIGNATURES CONTAINED ON THIS APPRAISAL ARE PASSWORD PROTECTED AND ONLY THE APPRAISER(S) SIGNING THE APPRAISAL MAINTAIN CONTROL OF THE SIGNATURE(S) AND THE PROTECTING SECURITY DEVICES.

THE READILY OBSERVABLE EXTERIOR AND INTERIOR AREAS OF THE SUBJECT PROPERTY WERE  INSPECTED.  IF THE PROPERTY WAS FURNISHED AT THE TIME OF INSPECTION, NO FURNISHINGS , RUGS, OR OTHER PERSONAL PROPERTY WERE MOVED OR INCLUDED IN THE FINAL ESTIMATION OF VALUE.  THE CONDITION OF THE ROOF WAS BASED ON WHAT WAS VISIBLE AND OBSERVABLE FROM GROUND LEVEL.

THE FINDINGS ARE BASED ON OBSERVABLE CONDITIONS NOTED AT THE TIME OF THE INSPECTION AND OTHER CONDITIONS KNOWN TO EXIST AT THE TIME OF THE APPRAISAL.  I AM NOT A LICENSED BUILDING CONTRACTOR OR PROFESSIONAL BUILDING/HOME INSPECTOR.  I AM NOT QUALIFIED TO SURVEY OR ANALYZE PHYSICAL ITEMS THAT ARE NOT READILY VISIBLE.  IF ANY PARTIES IN THIS TRANSACTION HAVE QUESTIONS OR CONCERNS REGARDING ANY MECHANICAL OR STRUCTURAL PHYSICAL PROBLEMS, CONDITIONS,INFESTATION, CONTAMINATION OR OTHER ISSUES REGARDING THE SUBJECT PROPERTY, AN EXPERT IN THE FIELD OF THAT SPECIALTY SHOULD BE CONSULTED.  THIS IS NOT A HOME INSPECTION AND DOES NOT OFFER ANY GUARANTEE AGAINST ANY STRUCTURAL DEFECTS.  IF ANY PARTY WISHES TO BE SO INFORMED, CONTACT THE APPROPRIATE PROFESSIONAL.

THE ROUTINE INSPECTION OF THE PROPERTY AND ANY IMPROVEMENTS IS FOR PURPOSES OF ESTABLISHING THE MARKET VALUE OF THE PROPERTY.  THE PROPERTY "INSPECTION" IS REALLY MORE OF AN "OBSERVATION". IT IS NOT REGARDED AS A FULL PROPERTY INSPECTION OF THE TYPE INTENDED TO REVEAL DEFECTS IN MECHANICAL SYSTEMS, STRUCTURAL INTEGRITY, ROOFING, SIDING, OR ANY OTHER PROPERTY COMPONENT. THE APPRAISER CLAIMS NO SPECIAL EXPERTISE IN THESE AREAS, NOR IS THE APPRAISER AN EXPERT REGARDING ISSUES RELATED TO FOUNDATION SETTLEMENT, WOOD DESTROYING INSECTS, RADON GAS, OR LEAD BASED PAINT.

NO ADVERSE ENVIRONMENTAL OR HAZARDOUS CONDITIONS WERE NOTED IN OR AROUND THE SUBJECT PROPERTY, WHICH WERE OBVIOUS OR VISUALLY DETECTABLE TO THIS APPRAISER. AS NOTED IN LIMITING CONDITIONS #5 .

-LEAD BASED PAINT DISCLOSURE: APPRAISER DOES NOT KNOW IF THE  PAINT USED ON THE SUBJECT PROPERTY WAS MADE PRIOR TO 1978 THERE MAY OR MAY NOT CONTAIN LEAD BASED PAINT AND/OR OTHER HAZARDOUS SUBSTANCES ON THE SUBJECT PROPERTY.  THE CLIENT IS HEREBY NOTIFIED THAT THE APPRAISER IS NOT QUALIFIED TO DETECT THESE SUBSTANCES AND THAT IS BEYOND THE SCOPE OF THIS APPRAISAL, TO ASCERTAIN THE PRESENCE OF LEAD BASED PAINT AND/OR OTHER HAZARDOUS SUBSTANCES THAT MAY BE PRESENT IN THE SUBJECT PROPERTY. THE CLIENT IS ADVISED TO CONSULT A QUALIFIED EXPERT(S) IN THE DETECTION OF LEAD BASED PAINT AND/OR OTHER HAZARDOUS SUBSTANCES IF FURTHER INFORMATION IS DESIRED.

APPRAISER HAS THE RIGHT TO CORRECT ANY DISCOVERED ERRORS.  THE LIABILITY OF DELUX APPRAISALS AND/OR ITS APPRAISERS IS LIMITED TO THE CLIENT (AS STATED IN THE REPORT) ONLY.  FURTHERMORE, THERE IS NO ACCOUNTABILITY, OBLIGATION OR LIABILITY TO ANY THIRD PARTY.  IF THIS REPORT IS DISSEMINATED TO ANY OTHER PARTY OTHER THAN THE CLIENT, THE CLIENT WILL MAKE THE THIRD PARTY AWARE OF ALL LIMITING CONDITIONS (PAGE 4 OF THE U.R.A.R. THEY MUST BE READ BY THE CLIENT), ASSUMPTIONS AND ALL RELATED DISCUSSIONS CONCERNING THE ASSIGNMENT.  THE APPRAISER WILL NOT BE RESPONSIBLE FOR ANY COST INCURRED TO DISCOVER OR CORRECT ANY DEFICIENCIES OF ANY TYPE PRESENT IN/OR AROUND THE SUBJECT PROPERTY (PHYSICALLY, FINANCIALLY AND/OR LEGALLY).

-ELECTRONIC SIGNATURE AND PHOTO COMMENTS
THIS APPRAISAL REPORT CONTAINS ELECTRONIC IMAGES AND/OR ELECTRONIC SIGNATURES. FANNIE MAE GUIDELINES INDICATE THAT THE PHOTOGRAPHS MUST BE CLEAR AND DESCRIPTIVE IN EITHER BLACK AND WHITE OR COLOR.  THE PHOTOGRAPHS MUST BE ORIGINALS THAT ARE PRODUCED EITHER BY PHOTOGRAPHY OR ELECTRONIC IMAGING. (FANNIE MAE PROPERTY AND APPRAISAL ANALYSIS - APPRAISAL DOCUMENTATION AND CERTIFICATIONS SECTION 204).

THIS APPRAISAL REPORT CONTAINS ELECTRONIC SIGNATURES, THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE (USPAP) STATEMENT NO. 8 (SMT-8) STATES THAT MEASURES MUST BE TAKEN TO INSURE THE INTEGRITY OF THE ELECTRONIC SIGNATURE.  THE APPRAISER MUST AFFIX HIS OWN SIGNATURE TO THE REPORT AND HE/SHE ALONE HAS THE PASSWORD.  ELECTRONICALLY AFFIXING A SIGNATURE TO A REPORT CARRIES THE SAME LEVEL OF AUTHENTICITY AND RESPONSIBILITY AS AN INK SIGNATURE ON A PAPER COPY REPORT.

THE USPAP AND FANNIE MAE GUIDELINES HAVE BEEN FOLLOWED IN THE APPLICATION OF BOTH PHOTOGRAPHS (IF APPLICABLE) AND ELECTRONIC SIGNATURES IN THE ATTACHED REPORT.

**Supplemental Addendum**

File No. 11010-X1

| | | | |
|---|---|---|---|
| Borrower/Client WEDEL | | | |
| Property Address 2993 CHERRY LAUREL LANE | | | |
| City SAN JACINTO | County RIVERSIDE | State CA | Zip Code 92582-3777 |
| Lender OWNER | | | |

-WARNINGS TO UNINTENDED USERS:

THE INTENDED USER OF THIS APPRAISAL REPORT IS THE LENDER/CLIENT. THE INTENDED USE IS TO EVALUATE THE PROPERTY THAT IS THE SUBJECT OF THIS APPRAISAL FOR AN ESTIMATED VALUE FOR TH OWNER OF THE SUBJECT PROPERTY. THIS APPRAISAL IS NOT INTENDED FOR A LENDING TRANSACTION.

REGARDLESS OF WHO PAYS FOR THIS APPRAISAL, THE INTENDED USER IS THE LENDER/CLIENT STATED ON PAGE 1 OF THE URAR ONLY, IN THIS CASE THE OWNER OF THE SUBJECT PROPERTY. THE SCOPE OF WORK IN THIS APPRAISAL HAS BEEN CUSTOMIZED FOR THE INTENDED USER. IT MAY BE INAPPROPRIATE FOR OTHER USERS AND PUT THEM IN JEOPARDY. THEREFORE, REGARDLESS OF THE MEANS OF POSSESSION OF THIS REPORT, THIS APPRAISAL MAY NOT BE USED OR RELIED ON BY ANYONE OTHER THEN THE STATED INTENDED USER. THE APPRAISER, APPRAISAL FIRM AND RELATED PARTIES ASSUME NO OBLIGATION, LIABILITY, OR ACCOUNTABILITY TO ANY THIRD PARTY. IF YOU ARE NOT THE STATED INTENDED USER CONTACT OUR OFFICE TO HAVE AN APPRAISAL CUSTOMIZED FOR YOUR NEEDS.

THE APPRAISER ASSUMES THAT THERE ARE NO HIDDEN OR UNAPPARENT CONDITIONS OF THE PROPERTY, SUBSOIL OR STRUCTURES WHICH WOULD RENDER IT MORE OR LESS VALUABLE. THE APPRAISER ASSUMES NO RESPONSIBILITY FOR SUCH CONDITIONS OR FOR ENGINEERING WHICH MIGHT BE REQUIRED TO DISCOVER SUCH FACTORS. THIS REPORT IS NOT A HOME INSPECTION AND THE APPRAISER ASSUMES NO RESPONSIBILITY FOR THESE ITEMS. THE SCOPE OF WORK COMPLETED WAS APPROPRIATE FOR THE NAMED CLIENT AND ANY INTENDED USES, BUT MAY NOT BE APPROPRIATE FOR OTHER THIRD PARTY USERS, SUCH AS A LENDER. THE CLIENT MAY USE THIS APPRAISAL FOR A SINGLE LOAN DETERMINATION ONLY (1 TIME USE). (SEE ADDENDUM STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS ON PAGE 4 OF THE U.R.A.R, THEY MUST BE READ BY ANY CLIENT OR BORROWER IN POSSESION OF THIS APPRAISAL REPORT)